All right, once you've had a moment to set your things on the desk, the table, we will call Case No. 19-30363, Brock Services v. Rogillio, Rogillio, Rogillio, I'm not really sure. Richard. Appellant. It pleases the Court, Your Honor, Edward Hughes on behalf of Richard Rogillio. Rogillio. Okay. Yes, Your Honor. May I read the first one?  Yes. I was at the hearing, a preliminary injunction finding that the restrictive covenants contained in Mr. Rogillio's employment agreement, which were overbroad at the time it was entered into, and determined to be ambiguous in 2018, November 2018, when the judge first looked at this issue, we believe that the Court erred in doing so. At the outset, I will note that there are effectively two versions of the provisions at issue. The one that Mr. Rogillio signed, and the one that, the version that was reformed and we contend was rewritten by the Court. As the Court knows, in Louisiana, under 23-921, non-competition agreements are against public policy and are to be strictly construed against the employer. Unless there is an exception in 921, which clearly makes clear what the restrictions are and reduces the scope to two years and where the parishes are clearly delineated on the front end, then those are to be deemed unenforceable. In this case, in granting the preliminary injunction, we believe that the Court effectively replaced 23-921 with general contract principles, effectively treating this as just a contract case. The Court agreed with my opponent's argument that, effectively, that if the employer drafts an ambiguous agreement, then 23-921 apparently no longer applies. In fact, my opponent's brief, as you'll note, barely references 23-921. It focuses on general contract principles. We believe that most of the cases cited where 23-921 was addressed and the boilerplate language referencing general contract principles were addressed did not involve even ambiguous agreements. In fact, there is no case that we could find where an employer was allowed to testify as to its intent on the scope of what it didn't want its employer to do. Since the Court, again, since the Court failed to follow the restrictions of 23-921, we believe that this should be reviewed de novo. I do not want to restate our briefs and the briefs stand alone and provide the information the Court needs. Of course, if the Court has any questions, I'd love to answer them, but I do have a few points I do need to make. One quick question. Yes, sir. Are you disputing the District Court's conclusion that the non-compete is ambiguous, or do you agree it's ambiguous and you're just disputing how the Court resolved that ambiguity? The latter, Your Honor. And I understand where that comes from, but we were placed in a bit of a pickle afterwards. Our opponent said that because we didn't dispute the ambiguity after the November 15th hearing, we can't argue that general contract principles apply. Well, we won at that hearing. The Court denied the preliminary injunction and ruled that the agreement was unenforceable. Better not to argue with the judge's ruling in your favor. Precisely, Your Honor. In addition, I will note that after that hearing, it should have been full stop. It should have been over. The Court found the agreement ambiguous. That's interesting because it kind of gets into this interplay of, in general, the notion is when there's an ambiguity, you can bring in other evidence, but then you have this notion of contra preferentum and how that fits in. And y'all have, obviously, differing views on that. So, my experience with contract interpretation is it's kind of a list. You start up here. You look at the contract. That's where you start. And then you go down the list of ways that you resolve concerns, harmonizing one paragraph with another, blah, blah, blah. And then at the very bottom is when you get into the ambiguity being still unresolved and you have contra preferentum and you have the notion of bringing in evidence. What tells us that under Louisiana law, we're just, we stop at contra preferentum and we don't get to? I would say that you don't stop at contra non preferentum or contra preferentum. You stop at, after 23-921, which is that it is construed against the employer and it is strictly construed. So, 23-921, the non-competition statute, looms over this entire proceeding. In fact, one of the contract principles, again, they're against public policy, one of the contract principles noted, general contract, was noted by my opponents and also noted by the judges that these should be interpreted to be determined effective, I believe is the way it was set forth. Well, under 23, that is completely contradictory to 23-921 when that is a, when it's a strict construction of, strictly construed against the employer. We did not cite this case in our brief because it was unpublished. Judge Clement dealt with a similar issue in, when she was on the district court bench and noted that these types of agreements, if you can't determine on the front end what you're restricted to, how on earth could they be enforceable on 23-921? That is the gearhead versus dupuis orthopedics case. That is the basis for our contention that this is unenforceable, unenforceable full stop, is that there is no way that Mr. Rahilly could have determined on the front end what he was getting into. And I'm not talking about the reformed, rewritten version. I'm talking the initial version. But the, well, no, the initial version did list a bunch of parishes. So wouldn't he at least be on notice that those parishes are in play? Well, the initial version, including but not limited to. Okay. But including but not limited to, even to a non-lawyer would mean at least these, I would say, parishes. That's not hard to figure out. I don't think it takes a law degree for that. Well, they wouldn't, well, I'm not sure it would be at least those parishes. I think those parishes could be applicable. But all parishes. By the way, if I'm wondering where can I work when I leave Brock, I know it can't be in those 10 parishes. I don't know what else it might encompass. Maybe if there's an 11th parish. And I'm saying 10. I didn't count them. But however many. There may be yet another parish that's right next door to one of the ones. And I may not be sure on that. Your Honor, I would challenge that in that at the time you signed the agreement, there's actually no way you could know. Because it is where you worked, where you telephonically contacted, or where you emailed within the last year of your employment with Brock. And this was done nine years prior. So are there parishes listed in the agreement? Certainly. I can't dispute that. The agreement says what it says. But there is nothing to indicate at the time he entered into the agreement that he would be restricted from those parishes. Perhaps if he worked there in the last full year of his employment with Brock, he may be restricted to those parishes. But at the time he entered into the agreement, there's no way he could have determined that. I would also say that you. I'm sorry, Your Honor. You haven't really explained how it is he can't at least understand those parishes. I'm still just having trouble with why that's not clear even to an ordinary person. The parishes were including but not limited to as applicable. So only to the extent, if he would have worked in those parishes within the last full year of his employment, he would have been restricted. Let's take away what restrictions those may have been. But as applicable. He doesn't know where he worked? No. He's not going to know where he was going to work or where he was going to send emails or where he was going to telephone. But he does know when he signs the contract that in the year before he leaves, wherever he's worked within those parishes, that's taboo. I don't know what work means, Your Honor. That's a separate issue. But I will grant your point in that regard, that when he—you're right. When he signs the contract, he will know in the last year if he's working. Now, I would also challenge that those parishes are listed, but as Judge Clement noted in the Dupuy decision, he doesn't know that the 100-mile radius is inapplicable. In fact, he doesn't even know that this agreement is not governed under Texas law, which is what they said it was. So I would say that— Yeah, but his testimony was he didn't really remember what his intent was. It was obviously not a big deal to him. All of this imagining that you're putting in his head, which I appreciate as a lawyer you have to do, isn't what he testified to. He wasn't staying up all night wondering what he was signing and terrified that he didn't know what 100 miles from the parish was and so on. It was just another day in the neighborhood. He signed the deal. And that's— And so given that, why can't the trial judge consider the evidence of what Brock's intent was? Because of 921, because it's against public policy, because a person who wants a job, who needs—who has decided that they're going to go to that company, they're going to go to that company, is in a completely different position than someone who is signing just a regular run-of-the-mill contract. They are forcing these people, and that's one of the reasons why these contracts are strictly construed against the employer, is they—that sign this contract and you get hired. If—once again, if the—I think this dichotomy is shown when you see that they brought to testify a general counsel from—a former general counsel, who at the time was their general counsel, who testified what the intent of the company was when it wanted to determine what he was not allowed to do. If that's the case, respectfully, I say, why didn't they put that in their agreement? So what I would say, in addition to that, before—I don't want to move off of this, but I do want to note that the customer solicitation issues, which is set forth in our brief, the district court noted that the customer solicitation 7.2 was deemed to be unenforceable and not to be enforced, and then took the testimony of the former general counsel and inserted it into what it purported to be a non-competition agreement related to the indirect or direct interest as manager or employee, which the district court took to mean work. We just don't believe under 23-921, and it's—the fact that it's against public policy, the fact that it must be strictly construed against the employer, and the fact that this employer drafted this agreement, we simply do not believe that this agreement is enforceable against Mr. Rogelio as an employee. Any further questions? Thank you, Your Honor. Is there time for rebuttal? Good morning, judges. Tom Hubert here on behalf of Brock Services. I'm a little bit hard of hearing, so I apologize in advance if I have to ask you to repeat any questions. I think, Judge Clement, that you hit the nail right on the head with your questions—Judge Haynes, I'm sorry—with your questions earlier. First of all, this is a procedural issue. Did Judge DeGravels properly follow the procedure to get to the point that he ultimately got to, to enforce the agreement and to enter the injunctive relief that was necessary? The first thing you look at, if you're correct, is, is the contract—does it fit within the four corners of the law, or do you need to reform it? The Louisiana Supreme Court says that when a restrictive covenant is overbroad, Mr. Hughes just indicated that he agreed that it was overbroad, courts must reform it if parties agree to a severability clause. So the severability clause was discussed— Well, but overbreadth and ambiguity are two different things. Absolutely. So once the overbreadth is addressed, we take out the including but not limited to and just say these parishes and this municipality, that's our cabin, if you will. Then you have the problem of, okay, so what does that mean, and is that still—can we make sense of that in that cabin? And then the court found it ambiguous, and everybody seems to agree it's ambiguous. You're not fighting that. They're not fighting that. So if it's ambiguous, then we get into the area I was talking about, which is which one comes first, contra preferentum or the ability to consider parole evidence in this list of contract interpretation rules? Okay. I can answer that question for you. SWOT 24, again, says—I mean, that was the case I just cited. It also stands for the proposition that—let me just read it. And I'll just read—this is a quote from the case. A non-competition agreement is a contract between parties and should be construed according to the general rules of interpretation of contracts in Louisiana Code 2045 through 2057. So the Louisiana Supreme Court instructs us that we use the general rules of contract interpretation. So the first thing is, do we need to reform it? Yes. We needed to reform it. We struck out a few lines, the lines—in particular, the ones that were said—within a radius. We also actually struck out including but not limited to, and then we struck out any municipalities within the parishes. So that was how it was reformed. The judge asked everybody in court at the first hearing, do you agree that severability clause applies? Everybody said yes. The judge then went ahead and accepted the reformation that was presented by Brock. Then you get to the code articles, Louisiana Code articles, and one of them in particular, 2056, states, in case of doubt that can't otherwise be resolved. So that comes first. A provision in a contract must be interpreted against the party who provided the text. So the first part of that provision is, in case of doubt that can't otherwise be resolved. So that takes us to extrinsic evidence, parole evidence, intent of the parties to determine the intent of the parties, and that's where the judge— So you're saying contraproferendum comes in dead last. Yes. After we've done everything else under the sun that we can do and we still are clueless, then we say, all right, you wrote it, you lose. Right. If it's ambiguous, even with the testimony that comes in. So we presented the testimony of T. Tron, who was the general counsel at the time that the agreement was drafted. And she testified to what it meant. And basically, it meant that Mr. Rogelio could not sit in Ascension Parish, which is not a listed parish, but yet reach into Orleans Parish or St. Bernard Parish or St. James, St. Charles, East Baton Rouge in particular was the big one, and direct traffic by managing Apache employees. And he also couldn't physically go into those parishes and perform work that was in competition with Brock. So that was her basic testimony, and the court accepted that as the intent of the parties. Mr. Rogelio had an opportunity to testify about what he believed the agreement meant. He offered no testimony on that. He said he was concerned only about compensation. So he didn't say one way or the other. So the court is left with some very clear testimony from Ms. Tron as to what Brock intended to have happen, and it was accepted by Mr. Rogelio, but not contradicting that in any way. Well, it makes sense if you're talking about competition. You shouldn't be able to stand at the line between the non-included parish and the included parish and shout across the line, come to my new company and ignore Brock. So I think that's where the judge finally ended up is it made sense that you can't be able to, particularly in this era of texting and whatever, you shouldn't be able to kind of loop around the barrier by standing on the other end of it. That's exactly right, and Judge DeGravels added in his ruling a reference to Civil Code Article 2049. So this is, again, one of the twelve articles that the Supreme Court said you look at for contract construction, and this is what it states. A provision susceptible of different meanings must be interpreted with a meaning that gives it, that renders it effective and not ineffective. So if Mr. Rogelio was able to stand on the line of Ascension Parish and bark orders across the line to somebody that's working at a plant, whether it be physically, by phone, text, email, then that would render it essentially useless. And that was another part of the testimony that T. Tron provided and the judge accepted, because it's common sense, it makes sense, and it makes the agreement effective. What about solicitation? It seems like Mr. Rogelio was pretty high up in Brock before he went to Apache, and so it would seem that it would cover a lot of things, what he did, in addition to sort of managing the company, he would also be talking to customers and things like that. So how does that intersect with the unenforceable non-solicitation clause? Okay, so he was hired to manage operations in the state of Louisiana, and that, again, that's testimony by T. Tron because she was the one that hired him, or she was involved in the hiring process with Mr. Rogelio. At the time that he left the company, his title was vice president of operations for the eastern region of Brock Services. Now, that covers more than Louisiana. That covers Texas, Louisiana, and the south area. Mr. Rogelio testified that his real position, in reality, he had parts of Mississippi and the southern part, the bottom, his words were the bottom part of Louisiana. So at the very least, he knew when he was working for Brock that he was going to be working in all the parishes from basically essentially from Lake Charles all the way across the state and all the way down south. Now, in the parishes listed in the actual agreement, there are three of them that are in northern Louisiana. We know that most of his work dealt with the southern part of Louisiana, and according to Ms. Tron, he was responsible for the entire state of Louisiana. So technically, all those other three parishes apply as well, and that's exactly what Judge Gravels found. As far as him not being able to answer the question that was posed earlier, not being able to know what he was to do, for the year prior, at the time that he signed the agreement, that just doesn't hold any water. Mr. Rogelio knew that he was going to be managing operations, and he testified that he went into the plants on a regular basis. He was on the road and off a lot, so he was going to these plants to make sure that the projects were going properly. What about the customer issue, the solicitation issue? I understand he's got a lot. Look, I get that a job like that is very all-encompassing, but what about the issue of the solicitation of customers, the meeting with customers, et cetera? All right, well, that's easy. We had evidence that we presented to Judge Gravels that we didn't have until our forensic evaluation was done. We found in expense reports, and this is back in January, early February timeframe, or the January timeframe for sure, that he had been meeting with customers, and I can tell you an example just in particular. A fellow named Dennis White with Performance Contractors, whose office was in East Baton Rouge Parish, they were discussing on behalf of Brock in August of 2018, they're discussing Beaumont work, which is a big Exxon facility in Beaumont. So that's in our and Brock's expense report. So he's meeting with customers for the purpose of getting work, so soliciting work. When he went to Apache, we have his expense reports that show that he's meeting with the very same individual, Dennis White with Performance Contractors, at an LSU football game discussing Beaumont work. So he's discussing the exact same work while with Apache that he was discussing with Mr. White while with Brock, and he's doing it in East Baton Rouge Parish, which is a listed parish in the Restricted Covenant. We have other examples that were put into the record as well, Triad, Electrica. Their argument is very specific. It's not that he wasn't engaged with customers that were, shall we call, shared, but rather that because 7.2 is specific and is unenforceable, you can't bootstrap that into 7.1 and include that in the injunction. So how do you respond to that? Well, we've cited cases that say, first of all, soliciting customers is a part of competition. It's very often that you have non-competition provisions and non-solicitation provisions in these agreements. And if one happens not to be valid, maybe the other one will be valid, and you enforce it to the extent that you can enforce it. In this case, the non-competition provision is valid, and it does, by definition, include soliciting of customers, particularly of Mr. Rogelio, because that was what his job was. Does it matter whether it's a preexisting customer as opposed to, I don't know, going to, as you say, a ballgame and just trying to meet other people and hope that they'll come and use your company? That's one kind of solicitation versus you have a longstanding customer and you're just trying to get more business from that customer. Does that difference matter? The non-competition provision encompasses his inability. It restricts him from talking to Brock customers and customers that he dealt with personally and or just Brock customers in general because it's a broader, more encompassing restriction, and which was recognized by 921 as being an appropriate restriction. Maybe I'm not making my point. The point of soliciting can encompass trying to get more work from a preexisting customer. That's what you've been talking about with East Baton Rouge and LSU game and all that. It can also mean the world is your oyster and you just go out and try to find a brand-new client that has never used Brock, has never used Apache as a new customer, a new potential customer, and try to solicit them. Are those different in this sphere? Yes, that's different. What he did for Brock the year prior to him leaving the company was to manage the operations, to go out and do business with customers, to seek new business from customers within the parishes that are listed, and that's what prohibits him from now going out and even trying to get new customers in those parishes on behalf of Apache. Now, we've said from the very beginning there are no restrictions on Mr. Rogelio working for Apache in Ascension Parish and going to any of the places in this entire world that's not listed in that agreement, and he can seek out any new business that's outside of those parishes. So if he were to get business from Dow, for instance, Chemical, in Alaska, and that's not part of the restrictive parish, he can go do that. But if he's trying to get work from Dow, any Spatner's parish, or St. Charles Parish, then he cannot do that. Let me ask you, as you just referenced what he can and can't do, what is the practical effect of any ruling, even if we were able to rule very quickly, because this injunction ends on September 3? So what is the practical effect of anything we do? To put it another way, why are we here? We've been asking that question ourselves. And I would like to go get a cup of coffee, frankly, right now. But that's a very good question. It does end in another month, and I think we mentioned in our brief that at that point that the jurisdiction of this court is finished, so there's no more jurisdiction. It goes back to district. But, I mean, let's say we rule before September 3. What impact does that have on the rest of the case? Is there a rest of the case? Are you all seeking something besides this injunction that will end September 3 unless we change it? Not under the terms of the agreement. Absolutely not. Once it's over, it's over on September 3. We're not going to try to enforce it beyond that point. And I don't think we legally can enforce it. Are you seeking damages? Pardon me? Are you seeking damages from Mr. Burwell? We are definitely seeking damages because we have Mr. Rogelio breaching the agreement. While the injunction may end, the case goes on. Either way we rule, the case goes on. Well, I mean, it's important to rule in our favor on him violating the agreement and maintaining the injunction in place through September 3 because that's exactly what should happen. And Judge DeGravels, as I said earlier, he did it by the book to each point from a legal standpoint. And then he looked at the evidence and he found based upon the evidence of all those expense reports that Mr. Rogelio was in the parishes that he should not have been in. And mind you, Judge, that at the original hearing, Mr. Rogelio testified that he was only working in Ascension Parish and the judge made the assumption that he was not going out to any of the other parishes that were restricted. And that's why he based his decision. And I want to clarify what Mr. Hughes said. He based his decision not to grant a preliminary injunction. He did not make any decision on the ultimate meaning of the contract. He did not ever say that the contract was unenforceable at that hearing, not one time. So that needs to be corrected in the record. The judge merely said, I am not ruling in your favor on this motion for preliminary injunction. And then he added that I believe you all will probably bring in some evidence to tell the court and a jury ultimately what the meaning of the provision is. Ultimately, so then that's where we're at is really regardless of how we rule, unless we somehow say this case is just impossible or something like that, but almost regardless of how we rule, the case goes back for merits of the damages. That's correct. Obviously our ruling would have impact on that. I get that. But your position is then whether we sustain the injunction or set aside the injunction or whether it becomes moot, you're going to trial for damages for the time that he did compete in your view. Yes, we are. And we have a lot of other claims against Mr. Hillio and the other defendants as well on computer fraud and abuse and defend trade secret act, conspiracy, those types of things. But that has nothing to do with the non-court. No, that has nothing to do with the issues that are before the court today. But the broader view of it is this case doesn't go away. And the company, Brock Services, definitely needed the relief that was provided by Judge Gravels. I didn't at the very first hearing bring any extra evidence because my reading of the agreement, along with the stipulations that were made by Mr. Hillio, which the stipulations were pretty simple, that Apache, Hillio is employed by Apache Industrial Direct Competitive Plaintiff at its office in Ascension Parish. That's one. What's the record site for that? Your Honor, I apologize, but it is the agreement concerning November 14, 15, 2018 temporary restraining order hearing. Could one of you find that for me? I just have a copy of it. You were reading from it. I didn't know. Right. But the second stipulation was Hillio is managing work for Apache. And at the very least, some of the parishes listed in the Hillio agreement. And third, Brock has operations, is doing business in each of the parishes listed in the Hillio agreement. So taking those stipulations at that time and reading the agreement, it meant that he was in violation of the agreement. A judge de Gravels threw a curveball and said, I'm reforming the agreement, but then under the Reformation there are four different interpretations. It's ambiguous. They're all legal. That's also a good point, is that his four different interpretations all complied with the strict reading of 921. They're just different ways of reading it, which required the extrinsic evidence to come in and find the intent of the parties. So we didn't offer any testimonial evidence at that first hearing. But he did say, I expect that that will happen in the future. We then filed a motion to reopen the preliminary injunction hearing to allow for the general counsel, T. Tron, to testify, and she did, to have Mr. Michael McGinnis, who was the CEO at the time of Mr. Hillio's resignation and at the time that he was hired. He was an officer with the company, which he did. And Mr. Hillio testified, all three. And only two of the three offered any insight to the court on the meaning of the agreement. And the judge found that, in particular, T. Tron was credible evidence, was a credible witness, and her testimony made sense. And it was along the lines of the reading that should be accepted by this court. So what's the damage claim worth? I'm sorry? What's your damage claim allegedly worth? The damage claim is, at this point, we have Valero and Exxon at various facilities have moved their business from Brock to Apache, which we believe is directly related to Mr. Hillio violating this agreement, and directly related to the evidence that we've already put into the record before Judge Gravels. There are multiple examples of him meeting with our customers and Apache now having that work. How do you quantify that? I'm sorry? How do you quantify that? Well, that's going to be a matter of discovery and finding out how much work they actually received. I mean, we know what we lost, which is one way to quantify it. And in the case of work that we lost at Beaumont, which was through this performance contractors deal, it's in the millions of dollars. Multi-millions of dollars. Over this short period of time? Yes, because these contracts, once you get them, they stick with the new contractor for a while. Your foot's in the door, and that's a huge deal. If they do well, they're going to get it into the future. So this obviously – Okay. And you've used your time, and it looks to me like the document you were referencing is different. It's like 1946 at SEC. Okay. Thank you for your rebuttal now. Thank you, Your Honor. I do want to note at the outset, right off the bat, they're an employer. We did not hear 23-921 even addressed. They run to general contract principles. Louisiana has a public policy against these types of agreements. They're their employer. They're the drafter of the agreement. If they wanted all of this, these reasons for Mr. Rehilly to stop – So you're saying general contract principles don't apply? I'm saying that SWOT 24 did not involve an ambiguous agreement. I'm saying that general contract principles are limited by 23-921. You can only qualify with one of these types of agreements as an exception. Louisiana law is clear, has been clear for 30 years, at least since SWOT 24 and since then. They ignored 23-921. Again, the SWOT 24 case was unambiguous. I do want to note the damage claim. The damage claim, they are seeking damages for a year against Mr. Rehilly for an agreement that was both overbroad and later reformed and then found to be ambiguous by a federal judge. I can't really address that. I was just interested in hearing this question. Well, I will note that a customer solicitation provision, 1620, whereby they agreed either it was not sought to be enforced or unenforceable, he goes and at that November 15th hearing, he goes and solicits customers when they say not sought to be enforced but unenforceable. And then six months later, Judge DeGravelle, after their argument, says, oh, wait, we're going to bootstrap that around. If they don't want customer solicitation, if customer solicitation is within the non-competition agreement, number one, put it there. Number two, why have the separate provision? Why is this the only rule you all are going to be back in the district court? We will, but perhaps not on this issue, Your Honor. I do believe that this agreement, this court can rule de novo that this agreement is unenforceable as written, as it is both ambiguous and it was overbroad to begin with. That wouldn't alter the trade secrets and fraud and whatever else he was listing. He was listing a long list of other things. That would not. Which I'm sure you think your client didn't do. That's right. I'm not suggesting otherwise. I'm just saying those are still in play. I certainly, yes, Your Honor, I believe that they would continue to assert those claims. But once again, I will note that the operative statute here is 23-921. You don't, as the drafter, get, hey, you know what I'm going to do? I'm going to draft an ambiguous agreement that no one can figure out on the front end and indirect or direct interest, which the district court took to mean as work, and then the district court found that to be ambiguous. You don't get to say that and say because I drafted an ambiguous agreement, I get to now resort to general contract. Of course, the determination that something is ambiguous is a question of law, so we're not bound to follow you, your opponent, your opponent, and the court all agreeing it's ambiguous. Your Honor, you're not bound to follow anything. Well, we have to give deference on facts. Yes, Your Honor. This is a question of law. I certainly believe this is a question of law, and that would be the first time any federal or Louisiana court said because it's ambiguous, you no longer take into account the restrictions of 921 and dive right into general contract principles, and that's mostly evident when you look at the general contract principle that says you've got to find, you've got to interpret these things to where they're effective. Well, when would the employee ever win? Thank you. Okay. Thank you both. We appreciate your arguments, and we're taking the case under submission. That concludes the order.